Mary-Louise N. ALBAHARY, Patricia N. Gilbertson, Dawn B. Norton, J. Harwood Norton, Nancy S. Norton, Norton–Lazenby Partnership, and Janet N. Sonstroem

v.

**CITY AND TOWN OF BRISTOL, CONNECTICUT**

Civil Action No. 3:94CV1891 (JBA).

United States District Court, D. Connecticut.

March 24, 1997.

Diane Woodfield Whitney, Michael A. Zizka, LeBoeuf, Lamb, Greene & MacRae, Hartford, for Plaintiffs.

Ben M. Krowicki, Sara Discepolo, Bingham, Dana & Gould, Hartford, for Defendants.

### RULING ON DEFENDANT'S MOTION TO DISMISS AND TO STRIKE
### [doc. # 10]

ARTERTON, District Judge.

Pending before the Court are defendant's Motion to Dismiss and Motion to Strike [doc. # 10]. In their ten count complaint, plaintiffs allege violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA") (Count One), violations of the Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (Count Two), nuisance (Count Three), trespass (Count Four), negligence (Count Five), inverse condemnation (Count Six), strict liability (Count Seven), violations of Conn. Gen.Stat. § 22a–427, prohibiting discharge of waste and pollution (Count Eight), remediation and containment costs under Conn. Gen.Stat. § 22a–452 (Count Nine), and unreasonable pollution under Conn. Gen.Stat. § 22a–16 (Count Ten).

Defendants seek to dismiss Counts Two, Six, Seven and Nine for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6), and to dismiss Counts One, Two, Three and Four for failure to join indispensable parties under Fed. R.Civ.P. 12(b)(7). In addition, pursuant to Fed.R.Civ.P. 12(f), defendant moves to strike paragraph (f) of plaintiffs' prayer for relief seeking punitive damages against a municipality, which plaintiffs do not oppose.

### FACTUAL BACKGROUND

Plaintiffs are joint owners of a parcel of land in the Town of Southington adjacent to the Bristol Recovery Center ("landfill"), owned, operated, and managed by the Town of Bristol during the relevant time period in this action. (Compl.¶¶ 1–3). Plaintiffs allege that defendant has caused and allowed the disposal of hazardous wastes and substances in the landfill resulting in the pollution and contamination of the soil, ground, and water beneath plaintiffs' land. (Compl.¶ 4). Further, plaintiffs claim that defendant operated the landfill as an open dump, allowed the discharge of hazardous wastes and substances into the landfill, and operated the landfill without a liner, allowing the migration of a leachate plume from the landfill into adjacent, privately owned property. (Compl.¶ 4). As a result of defendant's actions, plaintiffs claim that their land has been rendered undevelopable and has substantially declined in value because the contamination of the land's groundwater deprives it of its only source of potable drinking water. (Compl.¶ 5).

### COUNT TWO–Water Pollution Control Act

Defendant contends that plaintiffs' WPCA count must be dismissed because plaintiffs have not alleged that the city discharged pollutants from a "point source," a "discernable, confined and discrete conveyance," located at or upon the landfill from which the alleged contaminants are discharged into navigable waters. Defendant relies on *United ed States v. Plaza Health Laboratories, Inc.*, 3 F.3d 643, 646 (2d Cir.1993), which observes,

> Although by its terms the definition of 'point source' is nonexclusive, the words used to define the term and the examples given ('pipe, ditch, channel, tunnel, conduit, well, discrete fissure,' etc.) evoke images of physical structures and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways.

*Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir.1991), *rev'd in part on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), is factually similar to this case. In *Dague*, the Second Circuit recognized that the definition of point source should be broadly interpreted, and rejected Burlington's argument that the culvert could not constitute a point source because it did not add pollutants to navigable waters for the first time, but only transmitted already polluted water to other navigable waters. *Id.* at 1354–55 (citing *United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945, 947 (W.D.Tenn.1976) (under WPCA pollutants need not be discharged directly into navigable waters, and need not be discharged through conveyances owned by the polluter)).

The Second Circuit concluded that:

> Given the intended broad reach of § 1311(e), we agree with the district court that the Burlington culvert was a point source. We also note that the definition of

"discharge of a pollutant" refers to "any point source" without limitation. 33 U.S.C. § 1362(12). *Since the city's landfill caused pollutants to enter Beaver Pond, and since these pollutants were then conveyed into the rest of the Intervale by the railroad culvert,* the district court's conclusion that the city discharged pollutants into navigable waters from a point source properly applied the statute to findings that were not clearly erroneous.

*Id.* at 1355 (emphasis added).

In determining whether the facts of the instant case are sufficiently analogous to those in *Dague*, the relationship between the Eight Mile River on plaintiffs' land and the landfill itself is critical because the Second Circuit did not rely on the leachate's entrance into the groundwater beneath the landfill, and its flow through that groundwater into the Intervale, as a point source, but instead relied on the contiguous relationship of the landfill to Beaver Pond, and the pond's relationship to the railroad culvert.

■ Here, plaintiffs allege that the groundwater pollution caused by the Bristol landfill has created a plume of contamination that passes through plaintiffs' land and discharges into the Eight Mile River on that land, and that the Eight Mile River, in turn, passes through point sources such as roadway culverts further downstream. (Compl.¶ 16). A more complete factual record is necessary in order to determine the proximity of the landfill to the Eight Mile River, and well as the locations of the "roadway culverts further downstream," in order to determine whether the roadway culverts combined with the Eight Mile River can constitute a point source under *Dague*. However, under the liberal pleading standards of Fed.R.Civ.P. 8, and in light of the similarity of plaintiffs' allegations to *Dague*, defendant's motion to dismiss Count Two is denied.

### COUNT SIX–Inverse Condemnation

Plaintiffs allege that defendant's operation of the landfill in an illegal and dangerous manner, contaminating the groundwater and soil of plaintiffs' property, deprived plaintiffs of the reasonable use and enjoyment of their land, and was thus an illegal taking of that land in violation of the United States and Connecticut Constitutions. (Compl.¶¶ 16–17).

Defendant asserts that these allegations cannot support a ripe takings claim because plaintiffs have not alleged that they pursued available state remedies to recover adequate compensation for the purported taking, *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985), maintaining that under Connecticut law the remedy for inverse condemnation is suit against the condemning authority in Connecticut Superior Court, citing *Textron, Inc. v. Wood*, 167 Conn. 334, 346, 355 A.2d 307 (1974).

■ However, an inverse condemnation suit is an available state remedy for an allegedly unlawful government taking. *See Luf v. Town of Southbury*, 188 Conn. 336, 341, 449 A.2d 1001 (1982) (inverse condemnation damages action available for governmental takings in violation of Article First, § 11 of the Constitution of Connecticut and of the Fifth Amendment to the United States Constitution). Nowhere in *Textron*, nor in *Luf*, does the Connecticut Supreme Court hold that an inverse condemnation proceeding must be brought, in the first instance, in state Superior court. Thus, plaintiffs' inverse condemnation count brought in federal court under its supplemental jurisdiction is not "premature" under *Williamson*.

■ Defendant also claims plaintiffs must allege that they have no alternative use for their property, and that plaintiffs have failed to do so, under *Tamm v. Burns*, 222 Conn. 280, 284, 610 A.2d 590 (1992). Paragraph 5 of plaintiffs' complaint alleges that because there is no public water supply available to serve their land, the contamination of the land's groundwater deprives that land of its only source of potable drinking water, renders the land undevelopable, and causes a substantial decline in its value. Whether absence of drinking water in plaintiffs' land renders it unusable for "any reasonable and proper purpose" and whether "the economic utilization of the land is, for all practical

purposes destroyed," *Tamm*, 222 Conn. at 284, 610 A.2d 590, is a factual question inappropriate for resolution on a motion to dismiss. Defendant's motion to dismiss Count Six is therefore denied.

### COUNT SEVEN—Strict Liability

Defendant moves for dismissal of plaintiffs' strict liability claim because operation of a "landfill without adequate barriers against the transmission of polluted groundwater across the boundaries of the landfill" (Compl.¶ 16) is not an unreasonably dangerous activity under Connecticut law.

Maintenance of a strict liability claim requires proof of three factors: (1) an instrumentality capable of producing harm; (2) circumstances and conditions in its use which, irrespective of a lawful purpose or due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; (3) and a causal relation between the activity and the injury for which damages are claimed. *Caporale v. C.W. Blakeslee and Sons, Inc.*, 149 Conn. 79, 85, 175 A.2d 561 (1961). Further, "[a] person who uses an intrisically dangerous means to accomplish a lawful end, in such a way as will necessarily or obviously expose the person of another to the danger of probable injury, is liable if such injury results, even though he [or she] uses all proper care." *Caporale*, 149 Conn. at 82–83, 175 A.2d 561 (citing *Worth v. Dunn*, 98 Conn. 51, 59, 118 A. 467 (1922)). Whether an activity is abnormally dangerous is a question of law for the court. *Id.* at 85, 175 A.2d 561; *Green v. Ensign–Bickford Co.*, 25 Conn.App. 479, 485, 595 A.2d 1383 (1991).

Although the Connecticut Supreme Court has recognized ultrahazardous activity only with respect to blasting, pile driving and conducting research with highly volatile chemicals, see *Whitman Hotel Corp. v. Elliott & Watrous Engineering Co.*, 137 Conn. 562, 565, 79 A.2d 591 (1951) (blasting); *Caporale*, 149 Conn. at 85–86, 175 A.2d 561 (pile driving); *Green v. Ensign–Bickford Co.*, 25 Conn.App. at 482–83, 595 A.2d 1383 (experimental explosions), in the absence of any controlling Connecticut Supreme Court precedent as to whether disposal of hazardous substances in a landfill constitutes an ultra-hazardous activity, this Court is called upon to determine what it believes the state's highest court would find if the same issue were before it. *Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 105 (2d Cir.1991).

Although three federal courts in this District have held that the use and storage of hazardous materials, which result in a subsequent release, do not constitute an abnormally dangerous activity for which strict liability should be imposed, see *Arawana Mills, Co. v. United Technologies Corp.*, 795 F.Supp. 1238 (D.Conn.1992) (Cabranes, J.) (machine shop handled, stored, and leaked contaminates into soil); *Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. 435 (1994) (Covello, J.) (machine shop and distribution center deposited hazardous substances into a leaking underground storage tank); *The Stop and Shop Companies, Inc. v. Amerata Hess Corp.*, H–84–454 (MJB), 11 Conn.L.Trib. No. 11, at 1 (D.Conn. Oct. 16, 1984) (Blumenfeld, J.) (gasoline stored in underground storage tanks contaminated soil and groundwater), these cases involved the use and storage of hazardous materials by entities who were not in the business of accepting such materials for disposal, i.e., the use and storage of the hazardous substances were peripheral to the activity conducted by the entities involved, such as the operation of a machine shop. Thus, these courts were not presented with an entity whose very purpose it was to dispose of hazardous materials.

One Connecticut Superior Court, however, has addressed the issue, concluding that disposal of hazardous and toxic wastes at a landfill constitutes an abnormally dangerous or ultrahazardous activity sufficient to maintain a cause of action for strict liability. In *Barnes v. General Electric Co.*, No. CV 930529354, 1995 WL 447904 (Conn.Super. July 20, 1995) (Hennessy, J.), plaintiff property owners brought suit against, among others, the Town of Southington, owner and operator of a landfill adjacent to plaintiffs' property which accepted hazardous and toxic substances during the years that the Town owned and operated the site. Plaintiffs alleged that disposal of these toxic materials

was an inherently and unreasonably hazardous activity exposing defendants to strict liability for plaintiffs' injuries. Defendant contended that plaintiffs failed to state a claim in strict liability because no court has concluded that the Connecticut common law of strict liability applies to the landfilling of wastes, or resulting subsurface contamination.

The *Barnes* court analyzed the factors provided in §§ 519 and 520 of 3 Restatement (Second) Torts, which address the doctrine of strict liability for ultrahazardous activities.[1] Those factors include: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. *See* 3 Restatement (Second) Torts, § 520.

In addition to finding that "innocent parties should not be harmed, rather those parties who benefit, either economically or otherwise, from the abnormally dangerous activity should be held accountable," Judge Hennessey applied the Restatement factors and concluded that the defendants' storage, burial and disposal of hazardous and toxic wastes at a municipal landfill involved a high degree of risk of harm to property and persons and was thus abnormally dangerous. *Id.* at *6. In addition, she found that the likelihood of resulting harm from defendants' activities to property and persons is great, and that the risk of this harm cannot be eliminated by the exercise of reasonable care because of the nature of hazardous and toxic wastes, and the severity of their harmful characteristics. *Id.*

A critical difference between the factual posture of *Barnes* and those of *Arawana Mills, Nielsen,* and *Stop and Shop* is that the former dealt with direct disposal of hazardous contaminants into soil, resulting from the purposeful business activity of running a landfill. The latter cases address storage of such contaminants in connection with the operation of other businesses, which presents a different legal and factual problem. In *Connecticut Water Company,* Judge Corradino examined this distinction, reasoning that although a substance may be dangerous if dumped on the soil or fatal if swallowed or inhaled, it does not necessarily follow that when the substance is reasonably handled and safely stored as part of the industrial or business activity in which it is used, the use or storage of the substances should be defined as an ultrahazardous activity. In short, not all hazardous materials are highly corrosive and are therefore incapable of being stored safely. *Connecticut Water Company,* 1996 WL 168051, at *7.

A landfill that accepts hazardous materials for purpose of disposal stands on a different footing than a machine shop whose purpose is to repair engines, and whose storage and use of hazardous materials is incidental to that repair business. Indeed, as the court concluded in *Barnes,* disposal of hazardous and toxic wastes at a municipal landfill involves a high degree of risk of harm to property and persons, which unlike storage and use of hazardous materials, cannot be eliminated by the exercise of reasonable care.

Here, plaintiffs allege that:

The Defendant has caused and allowed the disposal of hazardous wastes and substances in the Bristol landfill in a manner that has resulted in the pollution and contamination of the soil, ground, and water beneath the Norton land with volatile organic compounds and other substances. The Defendant's activities in operating and managing the Bristol landfill includes [sic] operating it as an open dump, as defined by federal law; allowing the discharge in the landfill of hazardous wastes and substances; and operating the landfill without

---

**1.** The strict liability standard of *Caporale* does not necessarily conflict with, or set lesser standards than, the Restatement rule because the *Caporale* court cited *Whitman Hotel Corp.,* 137 Conn. 562, 79 A.2d 591, which expressly relied on the Restatement test as the criteria used to determine whether blasting was an ultrahazardous activity. *See Connecticut Water Company v. Town of Thomaston,* No. CV 940535590S, 1996 WL 168051, at *5 (Conn.Super. March 4, 1996) (Corradino, J.).

a liner, which allows the migration of a leachate plume from the landfill onto adjacent, privately owned property.

(Compl. ¶ 4).

■ Because hazardous materials are an instrumentality capable of producing harm, and because the circumstances and conditions of its disposal into a municipal landfill, irrespective of a lawful purpose or due care, involve a substantial risk of probable injury to the person or property of others, the Court concludes that disposal of hazardous and toxic wastes at a landfill may constitute an abnormally dangerous or ultrahazardous activity sufficient to maintain a cause of action for strict liability, and in light of plaintiffs' allegation that defendant allowed the discharge into the Bristol landfill of hazardous substances, plaintiffs are entitled to put forth evidence of the extent to which disposal of hazardous materials was allowed and encouraged at the landfill, as well as the toxic nature of the hazardous wastes plaintiffs allege were disposed of there. Accordingly, defendant's motion to dismiss is denied as to Count Seven.

### COUNT NINE—Reimbursement under Conn. Gen.Stat. § 22a–452

Although plaintiffs claim that "[t]he discharge of pollutants and waste from the Bristol landfill into the soil and groundwater of the Norton land renders the Defendant liable for all costs of containment and remediation pursuant to Conn. Gen.Stat. § 22a–452" (Compl. ¶ 18), defendant asserts plaintiffs have not alleged that they have incurred any costs subject to reimbursement under that statute, i.e., that they have contained, remove or mitigated alleged contamination of the property.

Section 22a–452 provides in pertinent part: (a) Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of ... hazardous wastes resulting from any discharge ..., of such substance or material or waste shall be entitled to reimbursement from any person ... for the reasonable costs expended for such containment, removal, or mitigation, if such ... hazardous wastes pollution or contamination resulted from the negligence or other actions of such person. ...

■ By its terms, § 22a–452 allows reimbursement of remediation costs only if a plaintiff has "contain[ed] or remove[d] or otherwise mitigate[d]" contamination. *See Warner v. Kedah Corp.*, No. 072964, 1995 WL 573828, at *6 (Conn.Super. September 20, 1995) (Stanley, J.) (citing *Connecticut Light & Power Co. v. Knight*, No. 33646 (Conn.Super. July 23, 1993) (Potter, J.) (party seeking recovery under § 22a–452 must undertake some action to contain, remove, or mitigate the effects of contamination to recover reasonable cleanup costs expended); *Bristol Shopping Plaza v. Vigilante Cleaners*, No. 338958 (Conn.Super. December 1, 1989) (Ripley, J.) (§ 22a–452 does not apply to action for damages which may or may not be expended for cleanup purposes)).

Therefore, because plaintiffs have not alleged that they have taken any action to remediate the alleged contamination of their property, or that they have expended funds for such remediation, defendant's motion to dismiss is granted as to Count Nine.

### COUNTS ONE, TWO, THREE AND FOUR–Failure to Join Necessary Parties

Plaintiffs request injunctive and declaratory relief pursuant to the RCRA (Count One), the WPCA (Count Two), nuisance (Count Three) and trespass (Count Four). Defendant argues that these counts seeking injunctive relief should be dismissed for failure to join all necessary and indispensable parties under Rule 12(b)(7). Defendant contends that the entity with ultimate responsibility for the operation, management and control of the landfill is the Bristol Resource Recovery Facility Operating Committee ("BRRFOC"), which is comprised of various municipalities, and formed pursuant to state statute to provide solid waste management service within the region, and to construct and operate a waste to energy facility, including disposal of solid waste residue and by-products. (Smith Aff. ¶ 6–7).[2] Further, defendant represents

---

2. Matters outside the pleadings may be considered in ruling on a Rule 12(b)(7) motion. *Circle*

**157**

that the City of Bristol leased the landfill to Ogden Martin Systems of Bristol, Inc. ("Ogden"), who arranged the operation of the landfill by a third party contractor. (Smith Aff. ¶ 9). The City of Bristol was selected as low bidder for that contract, and began to operate the landfill under an operating agreement with Ogden. (Smith Aff. ¶ 10). In short, defendant claims that because the landfill is subject to the Lease and Operating Agreement with Ogden, and is ultimately supervised and controlled by the BRRFOC and its members, plaintiffs' failure to join these parties requires dismissal of their injunctive claims.

Rule 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest.... If the person has not been so joined, the court shall order that the person be made a party.

Defendant argues that injunctive relief against the City of Bristol, for example ordering the clean-up of the landfill, would prejudice Ogden's and BRRFOC's interests in the landfill, as provided in the lease agreement between the City of Bristol and Ogden, and in the Inter–Community agreement creating and governing the BRRFOC. In support, defendant cites *International Society for Krishna Consciousness, Inc. v. New York Port Authority,* 425 F.Supp. 681 (S.D.N.Y. 1977) in which the religious group brought an action for injunctive relief against enforcement of an Authority licensing regulation governing the dissemination of religious literature and solicitation of contributions at airports under the Authority's control, including areas leased to airline tenants. Defendant

moved to dismiss for failure to join under Rule 19, contending that joinder of the airlines was required because of their substantial interest in the controversy regarding their space in the airport. *Id.* at 685.

The district court concluded that "[s]ince the possible determination by this court that the Port Authority, and not the airlines, has power to make regulations regarding the licensing of First Amendment activities in leased areas would substantially affect the rights of the airlines under their lease agreements, joinder is desirable for a just adjudication." *Id.* at 686. The district court directed plaintiffs to file an amended complaint, joining all airline tenants as party defendants, finding that dismissal of the action for failure to join the airlines as indispensable parties would be premature at that time. *Id.* at 686–87.

Although the affidavit of Ronald H. Smith, City of Bristol Director of Public Works, asserts that the entity with ultimate responsibility for the operation, management, supervision and control of the landfill is the BRRFOC, the Inter–Community Agreement forming the BRRFOC demonstrates that the interests of BRRFOC's member communities which may be affected by this litigation are financial ones in view of their obligations to pay for the removal and cleanup of hazardous waste from the landfill by virtue of indemnity agreements entered into by the participating communities. (Ex. 3 at 51–3, 72–3).

Similarly, Ogden's interests appear limited to the consideration it receives under the Landfill Lease Agreement with the City of Bristol. This Agreement provides that "WHEREAS, the parties anticipate that the Company [Ogden] will never operate the landfill and are entering into this Lease as a financing mechanism;" (Ex. 1 at 3). The Landfill Operating Agreement states that "the Company has never owned or operated the Landfill," and "never intends to own or operate the landfill." (Ex. 2 at 46). The Operating Agreement also states that "[t]he parties further acknowledge that the City has selected the site for the Landfill, has

*Industries v. City Federal Savings Bank,* 749 F.Supp. 447, 457 n. 2 (E.D.N.Y.1990), *aff'd* 931

F.2d 7 (2d Cir.1991).

developed the design for the Landfill, has operated and will continue to operate the Landfill, and as owner and permittee, bears ultimate responsibility for the Landfill." (Ex. 2 at 46). Those provisions demonstrate that Ogden has no ownership role in the landfill, nor any control or responsibility for its operations. Rather, the lease agreement between the City of Bristol and Ogden is merely a financing mechanism.

 In *Int'l Soc. for Krishna Conscious-ness,* the airlines' ability to regulate the operation of its leasehold was at issue in the pending litigation. Here, however, the interests of the BRRFOC and Ogden in the removal and remediation of hazardous wastes in the Bristol landfill is financial, and subject to indemnity agreements which would apportion the costs of any court ordered cleanup or remediation. (Ex. 3 at 51–3, 72–3); (Ex. 1 at 2). Therefore, the Court concludes that any injunctive relief granted plaintiffs would not impair or impede the ability of either the BRRFOC or Ogden to protect its financial interest under the Inter–Community Compact or Landfill Lease Agreement. Accordingly, defendant's motion to dismiss Counts One, Two, Three, and Four for failure to join necessary parties is denied.

### SUPPLEMENTAL JURISDICTION

Defendant argues that in the event the Court dismisses plaintiffs' federal RCRA claim (Count One) and WPCA claim (Count Two), it should decline to exercise supplemental jurisdiction over the remaining counts of plaintiffs' complaint arising under state law. However, because the Court has denied defendant's motion to dismiss plaintiffs' federal claims, defendant's motion to dismiss plaintiffs' state law counts on this ground is denied.

### MOTION TO STRIKE UNDER RULE 12(f)

Defendant's Motion to Strike is directed solely to paragraph (f) of plaintiffs' Relief Requested, seeking to "[a]ward the Plaintiffs punitive damages for intentional, wanton, and reckless conduct." Defendant argues that punitive damages are not recoverable against a municipality and thus plaintiffs' improper claim for relief should be stricken. *See City of West Haven v. Hartford Insurance Co.,* 221 Conn. 149, 602 A.2d 988 (1992); Conn. Gen.Stat. § 52–557n(a)(2)(A).

In light of plaintiffs' representation in their opposition memorandum that they do not oppose defendants' motion, defendants' Motion to Strike paragraph (f) of plaintiffs' prayer for relief is granted absent objection.

### SUMMARY

Defendant's Motion to Dismiss [doc. 10–1] is DENIED as to Counts One, Two, Three, Four, Six and Seven. It is GRANTED as to Count Nine. Defendant's Motion to Strike [doc. 10–2] is GRANTED.

IT IS SO ORDERED.